IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 13-cv-01633-RBJ

HEATHER BAKER,

    Plaintiff,

v.

CAROLYN W. COLVIN,

    Defendant.

---

ORDER

---

In this case, Ms. Heather Baker challenges the decision of the Commissioner of Social Security to deny her application for Supplemental Security Income ("SSI") and disability insurance benefits ("DIB") pursuant to Titles II and XVI, respectively. Jurisdiction is proper under 42 U.S.C. § 405(g). This dispute became ripe for decision by this Court on March 1, 2014 upon the expiration of time for Ms. Baker to file a reply brief. The Court apologizes to the parties and counsel for its delay in addressing the case.

### I.     Factual Background

Ms. Baker is 29 years old with an eleventh grade education and a GED. She has previously worked as a convenience store clerk, construction flagger, and livestock herder. R. 158. She claims that on June 15, 2008, symptoms associated with her bipolar disorder caused her to "have a hard time understanding things and being around people," ultimately forcing her to stop working. R. 133, 157, 180.

### a. **Medical Background**

Ms. Baker has a significant medical history spanning multiple providers and consulting examiners and encompassing various, evolving diagnoses and prescriptions. What follows is a chronological summary of the relevant medical facts. The record documents Ms. Baker's struggle with mental health issues since 2008, and the notes reveal that she and her family were privately dealing with these issues since even earlier—perhaps 2006. R. 217. These issues include mood swings, agitation, irritation, social withdrawal, and paranoia. *Id.* The depression—and perhaps some of these other symptoms—apparently began around the time she was told she would be unable to have children.

In August of 2009, Ms. Baker presented to Family Nurse Practitioner Louisa Sisnroy, revealing a long-simmering concern that she was depressed and a concomitant fear that going on medication for depression would make her suicidal. R. 215. Nurse Practitioner Sisnroy diagnosed depression and counseled Ms. Baker that there were many medications available that would not make her suicidal. She ultimately prescribed Zoloft. R. 216.

Ms. Baker struggled with the Zoloft, however, finding that it made her angry and sleepy, so in November 2009 a different treating provider, Dr. Patty Beercroft, M.D., switched Ms. Baker to Zyprexa for depression. R. 210. At the same time, Dr. Beercroft diagnosed bipolar disorder and completed a form indicating that Ms. Baker would be disabled for three to five months while her condition stabilized. R. 211. The Zyprexa apparently did not help and even caused additional anxiety and difficulty sleeping, leading Dr. Beercroft to switch Ms. Baker to Depakote for her depression. R. 209. After changing Ms. Baker's medication, Dr. Beercroft opined that Ms. Baker would be disabled for "over a year." *Id.* Ms. Baker struggled to

remember to take her Depakote which she explained to Dr. Beercroft at a January 2010 follow up visit. R. 208.

In March of 2010, Ms. Baker saw Dr. Vu Mai, M.D., after a miscarriage brought her to the emergency room. R. 256. Dr. Mai observed that Ms. Baker had normal speech, her thoughts were intact, her affect was bright and pleasant, and her judgment good. R. 256.

During that same month, Ms. Baker filled out an adult function report in which she described her daily activities. While she reported being able to perform a variety of household chores and engage in personal hobbies, she apparently had great difficulty completing tasks and needed assistance with some of them—remembering to take her medication, feeding her dogs, and cooking and cleaning, for example. R. 172-74. She was also afraid to go outside because she believes there are "people out there [who are] out to hurt [her]." R. 175. She reported a great deal of difficulty remembering things and understanding simple tasks. R. 177

In May 2010, Ms. Baker visited with another treating physician, Dr. Jane Ferguson, D.O., and revealed that she had stopped taking her medications since becoming pregnant and was feeling anxious and crying easily. R. 272. In response, Dr. Ferguson put Ms. Baker on Abilify and Celexa after consulting with Dr. Mai. R. 272. However within a few weeks, Ms. Baker returned to Dr. Mai complaining of complications with these medications. Dr. Mai instructed Ms. Baker to stop taking the Abilify, and added a new prescription for Seroquel. R. 268. He also cautioned Ms. Baker to stop drinking alcohol, smoking cigarettes, and using marijuana. R. 269.

In connection with Ms. Baker's disability application, she was examined by consultative psychologist Dr. Richard Madsen in September 2010. Dr. Madsen noted that Ms. Baker reported

bipolar disorder including rapid mood swings and depression. R. 277. The mood swings caused her to sometimes get "explosively angry and [going] after people, break[ing] things, [and] throw[ing] things." *Id.* Ms. Baker occasionally "lock[ed] herself in a room" due to depression and anxiety, and she became "anxious and at times panicky in crowds." *Id.* In addition she reported having thoughts of suicide, but no attempts. R. 278.

Dr. Madsen explained that Ms. Baker engages in "self-care, prepares meals, and does laundry, grocery, and shopping." *Id.* Her longest period of employment was five months. R. 279. She also reported using marijuana about once per month and that when she drinks alcohol she drinks "as much as [she] can." *Id.* She can manage only one or two hours of sleep at a time, and when she is off her medications she will sometimes stay awake for more than twenty-four hours. R. 277. Her appetite is generally low, except for occasional binge episodes. R. 278.

Dr. Madsen noted that Ms. Baker seemed to have a depressed mood, but that her memory and concentration were generally good. R. 280. He ultimately diagnosed Ms. Baker with bipolar disorder, post-traumatic stress disorder as the victim of childhood abuse, panic disorder with agoraphobia, impaired intellectual functioning, and assigned her a global assessment of functioning ("GAF") score of 50. R. 281. A score of 50 is on the border between serious and moderate symptoms, though 50 technically falls within the category of serious symptoms or impairments. *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012). As a result, he concluded that "[h]er ability to do work-related activities is impaired. She will have difficulty maintaining a regular work schedule, focusing and concentrating on work, relating to peers, coworkers, supervisors, and the general public." *Id.*

Shortly after Ms. Baker's exam with Dr. Madsen, a non-examining consultative psychiatrist, Dr. Mark Dilger, reviewed Ms. Baker's case. Dr. Dilger prepared a residual functional capacity assessment in which he concluded that "medication is currently controlling her mental impairments fairly well." R. 69. Furthermore her ability to understand and remember simple instructions was unimpaired though she did suffer from moderate limitations on her ability to remember more detailed instructions, to sustain concentration, to get along with coworkers and supervisors, and to travel, avoid hazards, and respond to simple changes. R. 72-73.

Ms. Baker visited with Dr. Mai for a follow up in October 2010, a month after the consultative reviews by Drs. Madsen and Dilger. Ms. Baker reported that her mood swings were better controlled according to family members, that she was calmer, and that she was experiencing no side effects. R. 310, 312. The next month, in November 2010, Ms. Baker was back in Dr. Mai's office for a physical for Colorado Aid to the Needy and Disabled ("AND"). Ms. Baker reported the same sorts of difficulties concentrating that she had previously reported, and Dr. Mai noted that her judgment was "questionable" though her affect was bright and thoughts appeared intact. R. 304. In a disability form completed at approximately the same date, Dr. Mai also opined that Ms. Baker would be unable to work for at least twelve months. R. 291. None of Ms. Baker's more recent examinations with medical professionals indicate that she sought additional treatment of her mental health symptoms.

In July 2011, however, after the ALJ in this case held a hearing, Dr. Madsen prepared a "check-box form" regarding Ms. Baker's limitations. In that document, he indicated that Ms. Baker's mental limitations would cause her to be late to work two times per week and miss work

two times per week, cause lapses in her concentration and focus five to ten times per day, and that she would be off task hourly and up to fifty percent of the time. R. 333-35. Also, according to Dr. Madsen, Ms. Baker could only tolerate up to fifteen percent of her time spent around co-workers, supervisors, or the general public. *Id.* All of these restrictions constituted marked limitations on concentration, persistence, or pace; marked limitations on social functioning; and moderate limitations on personal functioning, in Dr. Madsen's opinion. R. 335.

### b. Procedural Background

Ms. Baker first applied for benefits on November 13, 2009 alleging a disability onset date of June 15, 2008. Her date last insured is September 30, 2010. R. 33. Ms. Baker's initial application was denied, although she pursued her claims by requesting a hearing before an administrative law judge ("ALJ"). That hearing was held before ALJ E. William Shaffer on July 20, 2011. At the hearing, Ms. Baker provided additional details about her life and her impairments. She explained that her emotional volatility led her to argue with strangers while shopping. R. 50. She testified that she "[s]tay[s] at home as much as possible" to avoid people. R. 50. Finally, she often gets up to do something and completely forgets why she got up. R. 51-52.

The ALJ issued an unfavorable opinion on December 5, 2011. R. 30. The Social Security Administration uses a five-step process to determine whether a claimant qualifies for disability insurance benefits. At step one, the ALJ determined that Ms. Baker has not engaged in substantial gainful activity since her June 15, 2008 alleged onset date. R. 35. At step two, the ALJ determined that Ms. Baker suffers from the following severe impairments: "bipolar disorder, post-traumatic stress disorder, panic disorder with agoraphobia, and impaired

intellectual functioning and developmental learning disorder." *Id.* The ALJ also identified the following non-severe impairments: obesity, asthma, polycystic ovarian syndrome. R. 36. Finally, because there was no medically acceptable objective evidence to back up Ms. Baker's claims of arthritis, the ALJ concluded that those ailments were not medically determinable. *Id.*

Moving on to step three, the ALJ concluded that none of these impairments—together or in isolation—met or equaled the criteria of a listed impairment. Specifically, Ms. Baker does not suffer from at least two "marked" limitations or one "marked" limitation and repeated episodes of decompensation as required by the paragraph B criteria. Nor does she meet the definition of disability under the paragraph C criteria.

At step four, the ALJ assigned Ms. Baker a residual functional capacity ("RFC") to "perform medium work . . . [that is] unskilled work with decreased interpersonal contact with supervisors, co-workers, and the general public." R. 37. The ALJ determined that the "objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations." R. 38. In support of this conclusion, he gave "little weight" to Dr. Mai's opinion that Ms. Baker cannot work due to her bipolar disorder because that opinion was inconsistent with the evidence as a whole. *Id.* The ALJ also gave little weight to Dr. Madsen's opinions because they were based solely on one examination and were inconsistent with the evidence as a whole. R. 39. The opinion of Dr. Dilger, however, received great weight as it "is supported by the record as a whole." *Id.* That opinion states that Ms. Baker is

> able to understand and remember tasks and locations and very simple to simple routines; able to maintain adequate attention and concentration and to sustain for two hour intervals in an eight-hour workday; mild to moderate limitations in ability to accept instructions from supervisors and to get along with co-workers and general public; and mild to moderate limitations in ability to travel, avoid obvious hazards, and respond to very simple to simple changes.

7

*Id.* (citing Dr. Dilger's opinion, R. 73).  The ALJ concluded that while Ms. Baker's medically determinable impairments could be expected to produce the symptoms she complains of, "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  *Id.*  According to the ALJ, Ms. Baker's bipolar disorder appears to be well-controlled with medication (citing Dr. Mai's notes at R. 309), but Ms. Baker is inconsistent with her use of medication, and Ms. Baker has never been admitted to an inpatient psychiatric facility.  Finally, the ALJ noted Ms. Baker's "poor work history" and wondered whether that history suggested some other motivation for Ms. Baker's decision to apply for benefits besides a genuine medical disability.

The ALJ decided that Ms. Baker retains the ability to perform her previous work as a flagger because that job involved only light, unskilled work while Ms. Baker's RFC included medium work.  R. 40.  Then the ALJ made alternative findings at step five, concluding that Ms. Baker could also work as an industrial cleaner or a laundry worker—both positions that exist in significant numbers in the national economy.  R. 41.  As a result, the ALJ found Ms. Baker not disabled for purposes of the Act.  *Id.*

## II. <u>Analysis</u>

### a. <u>Standard of Review</u>

This appeal is based upon the administrative record and briefs submitted by the parties. In reviewing a final decision by the Commissioner, the role of the District Court is to examine the record and determine whether it "contains substantial evidence to support the [Commissioner's] decision and whether the [Commissioner] applied the correct legal standards."

*Rickets v. Apfel*, 16 F.Supp.2d 1280, 1287 (D. Colo. 1998). A decision cannot be based on substantial evidence if "it is overwhelmed by other evidence in the record. . . ." *Bernal v. Bowen,* 851 F.2d 297, 299 (10th Cir. 1988). Substantial evidence requires "more than a scintilla, but less than a preponderance." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). Evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

### b. Improper Credibility Determination

Ms. Baker first takes issue with the ALJ's decision to give little weight to her own subjective testimony about the intensity, persistence, and limiting effects of her symptoms. In response, the Commissioner argues that Ms. Baker's subjective complaints were contradicted by her daily activities, the objective medical evidence, the documented effectiveness of her medications, and her sparse work history. These are all legitimate bases for discounting a claimant's credibility, see 20 C.F.R. § 404.1529(c)(3), (4) (listing daily activities, effectiveness of medication, and consistency with other evidence as relevant factors in evaluating symptoms), yet in this case these inconsistencies arose only because the ALJ picked and chose facts favorable to a finding of non-disability and ignored other evidence. For that reason, I agree with Ms. Baker that the ALJ should have given at least some weight to her subjective complaints. Precisely how much weight to give them and how they relate to other evidence in the record is a question that the ALJ must resolve on remand.

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Diaz v. Secretary of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990). However, "[f]indings as to

credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen*, 838 F.2d 1125 (10th Cir. 1988) (footnote omitted).

Again, the Commissioner offers four reasons why the ALJ's decision to disbelieve Ms. Baker's testimony was supported by substantial evidence. I deal with each in turn. First, the Commissioner suggests that Ms. Baker's claims about the limiting effects of her mental health issues are contradicted by her own testimony regarding her daily activities. Specifically, the ALJ identified a supposed inconsistency between Ms. Baker's statements about difficulty going outside and difficulty remembering tasks and contrasting that with the facts that she takes care of her dogs, prepares simple meals, cleans the house, and socializes with her husband and mother. As Ms. Baker correctly notes, however, there appears to be no conflict at all among these facts. The ALJ fails to mention that these tasks take Ms. Baker an extraordinary amount of time and that she often requires assistance or reminders to complete them. When those facts are noted, the purported inconsistency vanishes.

Second, the Commissioner points to objective medical evidence that arguably contradicts Ms. Baker's claims about her limitations. The Commissioner notes that Dr. Madsen's exam revealed that Ms. Baker could count in sequence and recall three objects, apparently concluding that this evidence undercuts her statements regarding her problems with memory and concentration. R. 280. But this conclusion conflicts with the same evidence from which it is derived. In the same paragraph, Dr. Madsen recounted Ms. Baker's difficulty remembering other information provided in the exam and her difficulty doing arithmetic calculations. Dr.

Madsen—the one who is best positioned to draw conclusions from this objective evidence—ultimately concluded that Ms. Baker's concentration and memory limitations were marked.

The Commissioner offers another piece of objective evidence that supposedly undercuts Ms. Baker's testimony about the limiting effects of her anxiety: the lack of objective symptoms observed by Dr. Mai. R. 256, 304, 310. On these occasions, Dr. Mai noted that Ms. Baker's speech was normal, her affect was bright and pleasant, and her judgment was good, according to the Commissioner. However, again, this argument slightly mischaracterizes the evidence. During one of these visits, Dr. Mai actually stated that her "judgment [was] questionable." R. 304. And again, as noted above, some of the tests administered by Dr. Madsen during his exam revealed impaired concentration and memory—objective evidence tending to support her credibility.

Third, the Commissioner argues that Ms. Baker's symptoms appear to be relatively well controlled with medication. This is a much closer issue, and it is entirely possible that Ms. Baker's symptoms are so well-controlled that her own contradictory testimony ought to be discounted. But the Commissioner's stated justifications do not support this conclusion. The evidence that arguably demonstrates effective control with medication is a single treatment note from Dr. Mai stating that Ms. Baker reported that her family members believed the medication had improved her mood swings.

The fact that family members believe Ms. Baker's mood swings are well-managed by the medication does not totally discount Ms. Baker's testimony about the limiting effects of her other symptoms. Indeed, Dr. Mai's note explicitly states that while family members noticed a difference, Ms. Baker herself "did not feel much difference." R. 310. Moreover, as Ms. Baker

11

points out in her appeal, whether her mood swings are well-managed says nothing about the other reasons she is purportedly unable to work including her "inability to be around or get along with others, her tendency to get aggravated with other people, . . . memory and concentration problems, . . . and inability to complete tasks or follow instructions." ECF No. 17 at 17. Finally, the ALJ's credibility determination—based solely on this ambiguous statement of dubious applicability to Ms. Baker's other symptoms—entirely ignores Dr. Mai's later statements that endorse Ms. Baker's statements about the limiting effects of her other symptoms.

In fact, the record as it currently stands seems remarkably ambiguous and unhelpful on the precise question of whether Ms. Baker's medications are working. I suggest that the ALJ, on remand, delve more deeply into this question and further develop the record if necessary.

Finally, the Commissioner argues that Ms. Baker has a sporadic work history prior to her alleged onset date, suggesting that perhaps she simply does not wish to engage in substantial gainful activity. In support of this argument, the Commissioner cites 20 C.F.R. § 404.1529(c)(3) and *Bean v. Chater*, 77 F.3d 1210, 1213 (10th Cir. 1995). The regulation does say that prior work history may be considered when evaluating symptoms, but it does not say anything about an intermittent work history allowing an ALJ to conclude that a claimant is trying to game the system. Without more evidence in support of that conclusion, it is nothing more than speculation. *Bean* is easily distinguishable. In that case, the claimant quit working "several years before the alleged onset of disability". *Bean*, 77 F.3d at 1213. In this case, Ms. Baker— who is a younger individual who presumably has not had much time to develop a stable work history—appears to have been attempting to remain employed, albeit unsuccessfully, until she ultimately was fired and applied for benefits.

Taken together, these logical inconsistencies and mischaracterizations cast substantial doubt on the ALJ's decision to find Ms. Baker not credible.[1] Therefore on remand, the ALJ must make a new credibility finding without relying on the justifications debunked above.

### c. Improperly Analyzed Medical Opinion Evidence

Ms. Baker objects to the ALJ's decision to give little weight to Dr. Madsen's opinion and to give greater relative weight to Dr. Dilger's opinion. The ALJ's reasons for this relative weighing, summarized and defended by the Commissioner, are either legally deficient or inconsistent with the substantial evidence in the record. Therefore, at least on the record before me, I agree with Ms. Baker that the ALJ's decision to give Dr. Dilger's opinion more weight was an error.

In giving Dr. Madsen's opinion relatively little weight, the ALJ first noted that the opinion was based solely on one exam. Just because a physician's opinion is based on one exam is not, however, sufficient grounds to disregard it. *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (holding that a two month professional relationship "it is not by itself a basis for rejecting [an examining source opinion]—otherwise the opinions of consultative examiners would essentially be worthless, when in fact they are often fully relied on as the dispositive basis for RFC findings"). To be sure, the short relationship between Dr. Madsen and Ms. Baker might support an ALJ's decision to afford Dr. Madsen's opinion little weight, but only if the ALJ could identify other factors besides the brevity of the relationship. *Id.* Furthermore, if a short

---

[1] I have written elsewhere of my discomfort with the SSA's routine use of boilerplate language to describe the ALJ's assessment of the claimant's credibility. *See, e.g.*, *Lloyd v. Colvin*, No. 12-cv-3350-RBJ, 2014 WL 3585305, at *9-11 (Feb. 6, 2014). That boilerplate appears in this ALJ's opinion as well. However, what really drives my analysis here is the fact that the Commissioner failed to back up this boilerplate with a "more thorough analysis." *Holbrook v. Colvin*, 521 F. App'x 658, 664 (10th Cir. 2013) (unpublished). When the Commissioner corrects this analysis on remand, I strongly recommend abandoning this boilerplate as it is unhelpful and circular.

professional relationship were a standalone justification for giving a source little weight, then Dr. Dilger's non-examining review of the record would be subject to the same principle, and the ALJ should have accorded it little weight or explained why the brevity was outweighed by other factors.  Finally, coloring the entire analysis is the fact that "an examining medical-source opinion . . . is presumptively entitled to more weight than a doctor's opinion derived from a review of the medical record.  *Id.* (citing 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); *Winfrey v. Chater*, 92 F.3d 1017, 1022 (10th Cir.1996)).  I turn, then, to the other purportedly legitimate reasons provided for giving the opinion of Dr. Madsen (an examining opinion) less weight than that of Dr. Dilger (a non-examining opinion).

The only other reason provided for giving Dr. Madsen's opinion little weight is that it was inconsistent with the record as a whole.  This is a questionable conclusion.  The Commissioner now suggests that Dr. Madsen's opinions were inconsistent with the same evidence that the ALJ used to reach his negative credibility finding regarding Ms. Baker's testimony.  As explained above, the ALJ downplayed parts of the record that would have bolstered Ms. Baker's credibility, namely the objective medical evidence cited by Dr. Madsen during his exam.  The only clear example of contradictory evidence offered by the Commissioner is Dr. Mai's notes indicating that Ms. Baker had relatively intact speech, thoughts, and affect on several visits.  R. 256, 304, 310.  But, again, those notes are not as straightforward as the Commissioner suggests.  At times, Dr. Mai noted that Ms. Baker's judgment was questionable (R. 304), and at other times he opined that she would be disabled for

14

more than a year.[2] R. 291. The Commissioner also suggests that Ms. Baker's activities of daily life and her improvement on medication were both inconsistent with Dr. Madsen's opinion. In the above section on Ms. Baker's credibility, I discussed these supposed inconsistencies and need not revisit them here.

Lastly, the Commissioner now urges this Court to find that Dr. Madsen's opinion is entitled to no weight because it is a check-box form with no narrative supporting evidence. This argument misstates the record. While it is true that Dr. Madsen presented his functional limitations in a check-box form with no attached narrative evidence, his conclusions were undoubtedly drawn from his exam of Ms. Baker for which he prepared a narrative document. The Commissioner is surely aware of that document as she quotes it several times in her briefs. Therefore the cases and regulations that allow the Commissioner to give less weight to unsupported opinions are inapposite. *Cf. Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987).

The Commissioner offers a few separate justifications for why Dr. Dilger's opinion received great weight, and I now turn to those reasons. I agree that just because Dr. Dilger gave great weight to Dr. Madsen does not mean the ALJ, in giving Dr. Dilger great weight, had to adopt Dr. Madsen's opinion wholesale. Dr. Dilger's opinion diverges from Dr. Madsen's regarding the credibility of Ms. Baker's subjective complaints and her overall limitations. *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) ("there is no requirement in the

---

[2] This leads me to an issue that was not addressed in the briefs. The record indicates that Dr. Mai, a treating physician, endorsed the position that Ms. Baker would be disabled for at least twelve months. R. 291. Treating physicians' opinions are generally given controlling weight. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). Yet the ALJ quickly and summarily dismissed Dr. Mai's opinion as inconsistent with the record as a whole. The *Watkins* court required "sufficiently specific" reasons for rejecting the opinion of a treating source. The ALJ's fleeting reference to Dr. Mai's opinion and almost non-existent analysis of the topic surely runs afoul of *Watkins*. Although Ms. Baker did not raise this issue in her appeal, I flag it here in order to avoid needless errors on remand and because I have already decided to remand the case on other grounds.

regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question"). But that still does not answer the question of whether the decision to give Dr. Dilger more weight than Dr. Madsen was supported by substantial evidence.

Next, the Commissioner cites a non-binding Social Security Ruling stating that "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources." SSR 96-6p, 1996 WL 374180, at *2-*3. Even if this ruling was binding, it is unhelpful in this situation. The Commissioner makes no attempt to demonstrate why *this case* is an appropriate circumstance under the ruling.

Finally, the Commissioner offers—once again—the argument that the same evidence that contradicted Dr. Madsen's opinion supported Dr. Dilger's opinion. Yet, as I have explained, none of that evidence actually demonstrates inconsistencies in Dr. Madsen's opinion or in Ms. Baker's testimony. Curiously, the Commissioner discounts a significant number of opinions in this case on the theory that they are "inconsistent with the record as whole." But when one steps back and looks at the record as a whole, the emerging picture tends to support these numerous opinions rather than contradict them. For example, the fact that Drs. Beercroft and Mai both offered similar assessments to Dr. Madsen suggests that the evidence as a whole actually supports Dr. Madsen and contradicts Dr. Dilger, the exact opposite conclusion reached by the ALJ. It is of course the ALJ's duty to weigh all this evidence on remand, but suffice it to say that I am not convinced that the ALJ would reach the same conclusion about the relative weight of opinion evidence again after reweighing the evidence.

### d. **RFC Not Supported by Substantial Evidence**

This third argument of Ms. Baker's—that the RFC was not supported by substantial evidence—is in reality a reiteration of her argument that Dr. Madsen's opinion should have received greater weight. For that reason, I rely on my earlier analysis for this section and forgo a separate discussion of this argument. It will be the ALJ's responsibility on remand, after weighing each opinion according to the law and regulations, to determine Ms. Baker's RFC.

### III. **Conclusion**

Ms. Baker requests that the Court remand the case to the ALJ for an immediate award of benefits, or in the alternative to remand for further consideration. "[O]utright reversal and remand for immediate award of benefits is appropriate when additional fact finding would serve no useful purpose." *Dollar v. Bowen*, 821 F.2d 530, 534 (10th Cir. 1987). Further fact finding, however, *would* be helpful in this case. On remand, the ALJ should reevaluate Ms. Baker's credibility using permissible criteria and relying on a full and fair characterization of the record. If the ALJ finds that the record contains insufficient evidence regarding the efficacy of Ms. Baker's medications, then the ALJ will have to further develop the record. Similarly, the ALJ must reweigh the respective opinions of Drs. Madsen, Dilger, and Mai. After doing so, it will be the ALJ's duty—not this Court's—to determine Ms. Baker's RFC and whether she is able to perform jobs existing in significant numbers in the national economy.

DATED this 31st day of July, 2014.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge